## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

───────────────────

ALFRED BAIN,

        Plaintiff,

v.                                                          Civil No. 03-0036 WPF/KBM

CITY OF ALBUQUERQUE and
E.O. GUEVARA and P.K. APODACA,
in their individual and official capacities as
employees of the City of Albuquerque,

        Defendants.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon a Motion for Summary Judgment to Dismiss Plaintiff's Claims, filed December 11, 2003 (**Doc. 18**) by Defendants City of Albuquerque, Officer Elder Guevara and Sergeant Patrick Apodaca (sometimes collectively referred to as "Defendants"). Plaintiff Alfred Bain ("Plaintiff" or "Bain") alleges violations of federal civil rights and state tort law based on the unlawful conduct of City police officers. Having considered the parties' briefs and the applicable law, I find that Defendants' motion is not well-taken and will be denied.

### Background

Most of the facts relative to the events giving rise to this lawsuit are disputed.[1] In order to

───────────────────

[1] Plaintiff disputes some facts without explanation except for a general reference to groups of "Plaintiff's Statement of Material Facts." For example, Bain disputes Defendants' Fact No. 52, which concerns Plaintiff's recovery time from the Taser shot, by referring to Plaintiff's Facts Nos. 19-20. However, Facts Nos. 19-20 offer no information or evidence relative to Plaintiff's recovery after being stunned with the Taser. In such cases, the Court will accept Defendants'

set forth a coherent summary of these events, I start with a general narrative outlining the factual evidence, followed by disputed groups of facts according to each parties' recollection, in the context of specific claims.  On February 25, 2002,  around 5:17 a.m., Defendant Guevara ("Guevara"), an officer with the Albuquerque Police Department, responded to an auto burglary call in progress at a residence located in the vicinity of Menaul and Fourth Street.  Dispatch records indicate that the caller reported seeing two heads moving inside the house, and that one of the subjects was wearing a baseball cap. Ex. A.  While Guevara was reporting to the burglary scene, driving west on Menaul and turning north on Fourth Street, he saw a male wearing a baseball cap walking south on Fourth Street, within one block of the residence where the burglary was reported.[2] At the time, Guevara was wearing his full police uniform and was in a marked car.

Once the officers arrived at the residence and determined that the burglary suspects had left the area, Guevara advised the other officers that he remembered seeing someone with a baseball cap at Fourth and Menaul. Guevara left the scene of the burglary and as he approached Menaul going south on Fourth Street, he saw again the male wearing a baseball cap.  Guevara advised dispatch of his location. Guevara noticed that the man was not only wearing a baseball cap, but was carrying a bag.  Guevara stopped his vehicle, with its strobe light operating, and

───────────────

facts as true and undisputed.

[2] For sake of consistency, I use the term "baseball cap" in this discussion when referring to Plaintiff's headwear, but note that Plaintiff disputes the description in referring to the cap Plaintiff was wearing that morning.  The dispatch call identified the cap as a "baseball cap," ( Ex. A), and Guevara later remembered that the individual walking down Fourth was wearing a "baseball cap."  Ex. B at 26.  In his deposition, Bain agreed with a description of the cap as one in the "style of a baseball cap with a hard bill and then a soft body." Ex. B at 22.  The fine distinction Plaintiff makes between a hard-billed cap and a "baseball cap," (i.e., that a baseball cap has a baseball logo on it, and a non-baseball cap does not) is noted by the Court for what it is worth. See Ex. C. at 72.

exited to make contact with the man wearing the baseball cap.  The man later turned out to be the

Plaintiff and who was walking to his roofing job from the motel where he lived. Guevara came up

from behind Plaintiff, identified himself as a police officer and asked Plaintiff (or "yelled,"

according to Plaintiff) to stop. When Guevara first approached Bain, Guevara was about ten feet

away.  Guevara ordered Bain to drop the shopping bag at least three times before Bain did so.

Bain told Guevara, as he did several times during the encounter, that he was on his way to work.

From the point at which Guevara orders Bain to drop the shopping bag, Plaintiff's and

Defendants' versions of the facts drift into different universes.  In Guevara's statement of facts,

Bain refused to comply with Guevara's orders to stop, and instead kept moving away from

Guevara.  Bain contends that he did not act in a suspicious, hostile or evasive manner at any time

during the encounter.

There remain only a few undisputed facts in the narrative after that point.  The other

Defendant in this action, Sergeant Apodaca ("Apodaca"), came on the scene in responding to

Guevara's call for assistance.  Apodaca believed that by the time he arrived, the threat Plaintiff

posed to Guevara was very high. Apodaca used his Taser on Plaintiff's chest to incapacitate him.

The Taser was subsequently deployed as a stun gun on the left and right sides of Plaintiff's neck

(or face, according to Plaintiff), and finally, the back of his neck.[3]  Apodaca called for rescue

---

[3]  The Taser is a non-lethal use of force authorized by standard operating procedures of
the Albuquerque Police Department. When deployed, it interrupts the electrical system of an
individual to allow officers to get the individual under control.  This description offered by
Defendants in Facts No. 43 and 55  may be immaterial to the substantive issues here (as suggested
by Plaintiff), but it nevertheless provides useful information. An excessive force claim implies that
some kind of force was used. Therefore, some understanding of any of the specific measures used
in effecting that force would seem to be necessary.  Apodaca describes the Taser as causing a
muscle contraction that "freezes" the individual on whom it is used. Ex. D at 51.  The Taser can
be used both as a type of dart gun -- which is how it was used on Plaintiff's chest area when it

3

personnel to come to the scene because he used the Taser on Plaintiff.  Rescue arrived and treated

Bain, who refused to be transported.  It was eventually discovered that the shopping bag Bain was

carrying contained some personal items, including his tennis shoes, which he changed into when

he arrived at work.  The bag did not contain any weapons or contraband.[4]

Guevara filed a criminal complaint on February 25, 2002 against Plaintiff, charging him

with Assault Upon Peace Officer and Resisting Arrest.  On March 6, 2002, a suspect shot Officer

Guevara in the leg.  Guevara was placed on medical leave and unavailable for duty for several

months and unable to perform his regular duties of testifying at criminal trials.[5]  The charges

against Plaintiff were later dismissed without prejudice because of the uncertainty as to when

Guevara, who was the primary police officer involved in the bringing of those charges, could

return to duty and testify in court against Bain.  Ex. I.

### Discussion

The first three counts in the Complaint are brought under the Fourth Amendment

(Unreasonable Search and Seizure and False Arrest, Excessive Force, Malicious Prosecution).

Counts Four, Five and Six are state law claims brought under the New Mexico Tort Claims Act,

N.M.S.A. 1978 § 41-4-1 to § 41-4-27.  Count Seven alleges Supervisory Liability against the City

based on the doctrine of respondeat superior on all of the state law claims.

---

was first deployed – as well as a contact weapon in a "stun gun" manner, which works by directly
contacting the skin. Ex. D at 27.  The latter method was used for the second, third and fourth
times the Taser was used on Plaintiff.

[4] Guevara did not remember whether he or someone else looked in the bag.  It is also not
clear when the bag was checked. Ex. 2 at 93.

[5] According to an affidavit signed by an assistant district attorney assigned the complaint
against Plaintiff, the district attorney's office initially decided to prosecute the case.

## I.       Legal Standard

Once a defendant raises the qualified immunity defense on summary judgment, the plaintiff

bears a two-part burden.  First, the plaintiff must demonstrate that "defendant's actions violated a

constitutional or statutory right."  Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir.1995).

Second, the plaintiff must show that "the constitutional or statutory rights the defendant allegedly

violated were clearly established at the time of the conduct at issue." Id. (citing Davis v. Scherer,

468 U.S. 183, 197 (1984)). Once the plaintiff makes the required showing, the burden shifts to

the public official to show that there is no genuine dispute as to any material fact which would

defeat his or her claim of qualified immunity.  Pueblo Neighborhood Health Centers v. Losavio,

847 F.2d 642 (10th Cir. 1988).  A dispute about a material fact is "genuine" where "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  Ingels v. Thiokol

Corp., 42 F.3d 616, 620 (10th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  Specifically, the public official must show that no material issues of fact remain

as to whether his or her actions were "objectively reasonable" in light of the law and the

information he or she possessed at the time.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249

(1986).

The objective reasonableness standard is common to both the qualified immunity analysis

and the substantive inquiry for a Fourth Amendment claim.  These two inquires are not fused. See

Saucier v. Katz, 533 U.S. 194, 201 (2001). Factors relevant to the merits of a constitutional

excessive force claim differ from the qualified immunity inquiry's concern, which is to

acknowledge that reasonable mistakes can be made as the legal constraints on particular police

conduct.  An officer might correctly perceive all of the relevant facts, but have a mistaken

understanding as to whether a particular amount of force is legal in those circumstances.[6]

## II.     Fourth Amendment - Unreasonable Search and Seizure; False Arrest (Count I)

Plaintiff appears to limit this claim, and correctly so, to Guevara, since Apodaca was not present at the initial stop by Guevara.  Further, a police officer can rely on other officers' information for reasonable suspicion or probable cause.  Harris v. Evan, 795 F.Supp. 1060, 1064 (D.Kan. 1992) (reliability of information established where the police officer initiating the chain of communication received his information from some person who it seems reasonable to believe is telling the truth); Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997) (officer may rely on information furnished by other law enforcement officials to establish reasonable suspicion and probable cause for arrest).

## A.     Assertion of Constitutional Right

Plaintiff contends Guevara violated his Fourth Amendment right to be free from unreasonable seizure based on an unlawful stop in the absence of reasonable suspicion or probable cause.  As part of the qualified immunity analysis, the first determination I must make is whether Plaintiff has asserted a violation of a constitutional right. Siegert v. Gilley, 500 U.S. 226, 232 (1991).  The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV.  Where a police-citizen encounter rises to the level of a seizure within the meaning of the Fourth Amendment, such seizure must be reasonable to be valid.  United States v.

_____

[6] For federal claims brought under the Fourth Amendment, and thus Plaintiff's federal claims in this case, the subjective intent of the officer is irrelevant.  Williams v. Denver, 99 F.3d 1009, 1024 n.3 (10th Cir. 1996) (citing Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"); cmp., Wilson v. Seiter, 501 U.S. 294, 299 (1991) (inquiry into prison official's state of mind is required when it is claimed that the official has inflicted cruel and unusual punishment").

Sharpe, 470 U.S. 675, 682 (1985).

Formal arrests, or seizures that resemble formal arrests, must be supported by probable cause to be reasonable.  United States v. Perdue, 8 F.3d 1455, 1461 (10th Cir.1993).   However, mere investigatory detentions of persons may require less than probable cause to be reasonable. In making reasonable-suspicion determinations, courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.  U.S. v. Arvizu, 534 U.S. 266 (2002)(citing Terry v. Ohio, 392 U.S. 1 (1968)).  Terry stops "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." Michigan v. Summers, 452 U.S. 692, 699 (1981).  Neither "inarticulate hunches" nor "unparticularized suspicion" will suffice to justify an investigatory detention.  Terry, 392 U.S. at 22, 27.  However, in determining the reasonableness of an investigative detention, "common sense and ordinary human experience must govern over rigid criteria." United States v. Walraven, 892 F.2d 972, 975 (10th Cir.1989) (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).  Further, the Fourth Amendment "does not require police officers to close their eyes to suspicious circumstances." Id. at 976 (quoted case omitted).

According to Plaintiff's account of events, on February 25, 2002, at approximately 5:00 a.m., he was on his way to his roofing job.  Bain was wearing a jacket, work boots, and a baseball cap. He was carrying a plastic shopping bag which contained a pair of tennis shoes.  Bain is described in Plaintiff's brief as "illiterate, and slow minded." Response at 12.  As he was walking south on Fourth Street to Menaul, Bain noticed two squad cars pass by with their strobe lights

operating.  About five to ten minutes later, after having walked about two or three blocks, he was approached from behind, and someone "yelled" at him to stop.  He stopped and turned around, and saw Guevara who was in police uniform, standing about ten to fifteen feet away from him, near a patrol car.  Ex. C at 32.  Plaintiff states that Guevara did not identify himself, nor did Guevara explain why he asked Bain to stop.  Guevara then "yelled" at him to drop the plastic bag Bain was carrying.  Bain told Guevara that he was on his way to work.  After dropping the bag, Bain started walking toward Guevara until he was a short distance from him, about three to six feet.  Ex. C. at 36-37.  Bain did not recall any conversation between them. Plaintiff was angry because it seemed as though Guevara did not believe him when he said he needed to get to work, Ex. C at 73, and he turned away from Guevara  to resume walking to work.  Guevara kept "trying to trip" Plaintiff by putting his foot in front of Bain and trying to push him over to the ground, and Bain kept moving his foot in response.  Bain next remembered Guevara grabbing his arm, and other officers appeared, who were grabbing him and holding him back.  Bain states that he did not resist the officers.  He heard an officer yell several times that he was going "to shoot," and then Plaintiff was Tasered in the chest by an officer.  Plaintiff fell to the ground and was Tasered several more times in the neck.  He was then taken into custody.

Under these alleged facts, Bain has asserted facts which come under the contours of Fourth Amendment protection, and thus has successfully asserted a violation of a constitutional or statutory right.

B.     Whether Right Was Clearly Established [7]

---

[7]  Plaintiff comments that Defendants' failure to make an argument as to this prong of the inquiry, i.e., that the law was not clearly established at the time of the incidents giving rise to this lawsuit, should result in a denial of their motion.  As I indicate in my discussion, I find that the

The law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains. Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir.2002). In order for the law to be clearly established, it is not necessary that the facts are "fundamentally similar." Roska et al v. Peterson et al.,328 F.3d 1230 10th Cir. 2003)- on rehearing); Patrick v. Miller, 953 F.2d 1240, 1249 (10th Cir.1992) (precise factual correlation between the "then-existing law and the case-at-hand is not required").

The law that a search or seizure must be objectively "reasonable" under all the circumstances has been "clearly established for a long time." Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1196-97 (10th Cir. 2001) (citing Terry, 392 U.S. at 21-22)). Plaintiff's recitation of events does not present either a novel theme, or novel types of facts. The facts in this case are based on a commonly recurring theme of whether a walking police encounter that rises to the level of a Terry stop is supported by reasonable suspicion. See, e.g., Gallegos et al., v. City of Colo. Springs, 114 F.3d 1024, 1027 (10th Cir. 1997) (cited cases omitted); U.S. v. Davis, 94 F.3d 1465 (10th Cir. 1996). Thus, Plaintiff's right to be free from unreasonable seizures was sufficiently established in February, 2002, such that a reasonable person in Guevara's position would have known that his conduct violated that right. Butler v.

---

relevant law was clearly established at the time of the events in question. Thus, there is no need to address whether Defendants' failure to argue the issue waives the issue. However, even if a defendant cannot show that the law was not clearly established, a defendant can still prevail at summary judgment by showing no genuine issue of fact. See Hinton v. City of Elwood, Kan., 997 F.2d 774, 779 (10th Cir. 1993) ("Once the plaintiff meets this twofold burden, the public official then assumes the *usual* summary judgment movant's burden of showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law") (emphasis added).

<u>City of Prairie City, Kan</u>., 172 F.3d 736, 744 (10th Cir. 1999) (citing <u>Tonkovich v. Kansas Bd. of</u>

<u>Regents</u>, 159 F.3d 504, 516 (10th Cir. 1998)).

3.      <u>Whether Defendants Are Entitled to Summary Judgment</u>

        Guevara offers an account of events to support his contention that his actions were

objectively reasonable in light of the information he possessed at the time.  In his deposition,

Guevara testified that after exiting his police vehicle, he approached Plaintiff, identified himself as

a police officer several times, and told Plaintiff to stop.  Bain appeared to acknowledge Guevara's

presence, but only stopped walking after the third request to stop.  Guevara became concerned

that Plaintiff, who was about ten feet from him, might have had a weapon on him or in the bag

that Plaintiff was carrying.  Ex. B at 42-45.  Bain stopped after initially looking back, but

continued to walk away from Guevara.  Guevara continued to inform Bain he was not free to go,

while moving in toward Plaintiff, who continued to walk even further. Guevara explained to Bain

that he was detaining him just until the party who reported the burglary could show up and verify

that Bain was not involved in the crime, since he matched the description of the burglar. Ex. B. at

46.  Although he did not specifically inform Bain that he would be arrested and would go to jail if

he did not stop, Guevara told Bain that he was not free to leave.  Ex. B. at 51.  Bain appeared

agitated, and said he had to go to work.  Guevara then told Plaintiff that he would call his boss to

explain that Bain would be a few minutes late to work.  Ex. B at 49.  Guevara again indicated that

he was detaining Bain because he matched the description of the burglary suspect.  Guevara, still

concerned that Bain might be carrying a weapon, intended to conduct a pat down search for

weapons, and asked Bain to sit down on the curb.  Ex. B at 53.  Bain did not comply with the

request, and kept moving away from Guevara as Guevara repeatedly told him to stop.[8]

Guevara closed in to a distance of about two or three feet from Bain, and started to grab Bain's arm.  Guevara says Bain "shrugged away," turned to face him, and "balled up his fists and started advancing" towards Guevara.  Ex B at 69.  Bain's fists were raised in a "fighting position" and his expression was angry.  Guevara was then about a foot or so from Bain, who started to advance toward Guevara with fists up and a "blank stare on his face."  Guevara then informed Bain that he was under arrest. Ex. B at 70.  Guevara felt at risk of being battered. He sidestepped Plaintiff at a 45-degree angle, telling him to turn around and put his hands behind his back.  He grabbed Bain's left arm, put it in a "compliance hold," and walked him toward the patrol vehicle. Guevara placed Bain on the front of the vehicle and called for assistance.

While both of them were leaned over the car, Guevara continued to hold Bain down because Plaintiff was actively struggling to get away from him.  Ex. B at 72-73.  Guevara still had not conducted a search for weapons.  In an effort to get Bain to comply and to sit down on the curb, both of them tripped on the curb. Guevara fell on top of Bain, telling him to give him his right hand, which Guevara could not see, and which Guevara was still concerned might be reaching for a weapon.  Bain continued to struggle, and Guevara continued to try to stabilize him. Apodaca arrived at this point.[9]

Reasonable suspicion is a less demanding standard than probable cause. United States v. Treto-Haro, 287 F.3d 1000, 1004 (10th Cir.2002) (quotation omitted).  While probable cause

---

[8]  Guevara's criminal complaint against Plaintiff states: "I asked Mr. Bain to sit on the curb. He tried to walk away. I grabbed onto his arm and he pulled away, balled his fist. I told him that he was under arrest and he tried again to walk again. After a short struggle, Sgt. Apodaca Tasered him, and he was arrested. . . ." Ex. E.

[9]  The facts from this point are not relevant to the circumstances surrounding the initial stop, and therefore, not relevant to Plaintiff's Fourth Amendment claim based on unlawful seizure.

means "a fair probability that contraband or evidence of a crime will be found," reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity. Id., 287 F.3d at 1004.  United States v. Sokolow, 490 U.S. 1, 7 (1989) (quotation omitted).  To determine whether Guevara had reasonable suspicion to initially stop Plaintiff, I consider both "the quantity of information possessed by law enforcement and its reliability." Alabama v. White, 496 U.S. 325, 330 (1990).  Both factors must be viewed under the totality of the circumstances. U.S. v. Tucker, 305 F.3d 1193, 1200 (10th Cir. 2002).

The question here is whether a reasonable juror would consider the stop to be justified under the law governing Terry stops.  Not all police-citizen encounters implicate the Fourth Amendment.  Gallegos, 114 F.3d 1024, 1027 (10th Cir. 1997).  Officers can approach citizens and ask questions without needing suspicion of wrongdoing, until the individual ends the encounter. Id.  The burglary report indicated that two individuals were involved in the burglary, and that one of the individuals was wearing a baseball cap.  The report did not include any information about either individual carrying a bag.  Bain was wearing a baseball-style cap and was carrying a plastic shopping bag one block or so from the burglary scene when Guevara stopped him.  Bain was walking normally, and Guevara recalled nothing peculiar in his stride or demeanor.  Ex. B at 41.  Parties dispute whether Bain was ordered to stop or requested to stop, and whether Bain stopped when he was initially asked to stop.  Guevara noted that Bain was not "coherent" at times, and that "it took him a while to process stuff. . . ." Ex. 2 at 97.  However, it is disputed what conversation, if any, occurred between Guevara and Bain, and whether Guevara actually informed Bain of the purpose of the stop.

In Gallegos v. City of Colorado Springs, 114 F.3d at 1024, police received dispatches

concerning suspicious activity in neighborhood.  One dispatch reported a "prowler" in the

neighborhood and another reported an apparently drunk man was arguing with a woman.  The

court found that the investigatory stop of an individual who matched the description of the man,

who smelled of alcohol and was crying and talking loudly to himself, was based on reasonable

suspicion that the suspect was involved in criminal activity, as required to support an investigatory

stop.  The facts in the present case fall somewhere in between Gallegos and an officer arbitrarily

stopping someone walking down the street.  Thus, the integrity of the initial stop cannot be

determined by summary judgment, given that some of the material facts are disputed.

*Reasonable Suspicion for Further Detention*

Terry stops must be limited in scope to the circumstance which justified the stop in the

first place.  United States v. King, 990 F.2d1552, 1557 (10th Cir. 1993) (citing Terry, 392 U.S. at

20).  Police officers are authorized to take steps which are reasonably necessary to protect their

personal safety and to maintain the status quo during the course of a Terry stop.  An encounter

between a police officer and an individual which goes beyond the limits of a Terry stop, however,

may be constitutionally justified only by probable cause or consent.  Gallegos et al., v. City of

Colo. Springs, 114 F.3d at (cited cases omitted).  It is undisputed that Guevara grabbed Bain's

arm at some point and made it clear that Bain was not free to go.  U.S. v. Brignoni-Ponce, 422

U.S. 873, 877(1975) (police officer has "seized" person when he accosts an individual and

restrains his freedom to walk away); cmp., U.S. v. Mikulski, 317 F.3d 1228 (10th Cir. 2003)

(initial interaction was consensual where plainclothes detectives walked up to stopped truck, did

not block exit, identified themselves, and did not display weapons or use coercive language or

tone). What is not clear is whether Bain was legally "seized" prior to that time, and whether

Plaintiff's behavior prompted Guevara at any time during the encounter with "a particularized and objective basis" for suspecting that Bain had been, or was, engaged in unlawful activity. U.S. v. Davis, 94 F.3d 1465 (10th Cir. 1996).

Guevara presents facts which describe Bain's demeanor as threatening and assaultive, and his conduct as evasive. Plaintiff, on the other hand, admits that he was angry, but denies that he ever raised his voice to Guevara, or struggled with him, except when Guevara was trying to trip him and push him to the ground.  See.,e.g., Smith v. Spain 133 F.3d 933 (Table) (10th Cir.1998) (comparing defendant in another case, who was walking away from the police immediately prior to the "stop" and was posing no immediate threat, to plaintiff in case at bar who was walking towards the police in an angry and threatening manner and was attempting to extract something from his fannypack). These completely incongruent reports need to be resolved by a fact finder. Also, under Plaintiff's factual account which I must view favorably at this stage, Guevara would arguably have had no basis to detain Plaintiff any further once he complied with the initial stop and dropped the shopping bag.  Guevara conceded that the shopping bag made no suspicious sound when it was dropped, such as the clinking of  heavy or metal objects.  Ex. 2 at 46.  See, e.g., U.S. v. McSwain, 29 F.3d 558 (10th Cir. 1994) (once police officer approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied, and further questioning to plaintiff about vehicle and travel itinerary, and to request for license and registration exceeded the scope of the stop's underlying justification).

The true facts in this case lie somewhere behind the parties' contradictory accounts. The relevant and material circumstances are disputed, and the accuracy of the facts depends on whose version is credible. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (drawing of

14

legitimate inferences from facts is jury function, not judge function on motion for summary judgment.  Therefore, Defendants are not entitled to summary judgment on Plaintiff's claim under the Fourth Amendment based on unlawful seizure.

## III.      Fourth Amendment - Excessive Force (Count II)

Plaintiff's Fourth Amendment claim alleging the use of excessive force is directed against both Guevara and Apodaca.

### 1.        Assertion of Constitutional Right

A police officer violates an individual's Fourth Amendment right to be free of excessive force during an arrest if the officer's arresting actions were not "objectively reasonable in light of the facts and circumstances" confronting the officer.  Graham v. Connor, 490 U.S. 386, 397 (1989) (quoted case omitted); Cruz v. City of Laramie, 239 F.3d 1183, 1188 (10th Cir.2001). The officer's conduct must be assessed from the perspective of a "reasonable officer on the scene," acknowledging that the officer may be "forced to make split-second judgments" in certain difficult circumstances.  Medina v. Cram, 252 F.3d 1124, 1131 (10th Cir.2001) (quoting Graham, 490 U.S. at 396-397).  Whether an officer acted reasonably in using deadly force is "heavily fact dependent," Romero v. Board of County Comm'rs, 60 F.3d 702, 705 n. 5 (10th Cir.1995), and is considered in light of the totality of the circumstances.  Tennessee v. Garner, 471 U.S. 1, 8-9 (1985).  Factors considered in the analysis include the alleged crime's severity, the degree of potential threat that the suspect poses to an officer's safety and to others' safety, and the suspect's efforts to resist or evade arrest.  Medina, 252 F.3d at 1131.

Plaintiff alleges that Guevara approached him and began to try to trip him to the ground. He asserts that he was Tasered in the chest, and several more times on the neck, even though he

15

did not resist Guevara and Apodaca, who arrived later on the scene. Bain maintains that the force used by the officers was neither reasonable nor necessary.  These assertions form a viable constitutional claim under the Fourth Amendment's protection against the use of excessive force.

2.    Whether Right was Clearly Established

It would have been clear to a police officer in February, 2002, that it was unlawful to use more force than reasonably necessary during an arrest.  See Butler v. City of Norman, 992 F.2d 1053, 1054 (10th Cir. 1993) (right to be free from excessive force in course of arrest or other seizure, as well as objective reasonableness standard) (citing Graham v. Connor, 490 U.S. 386 (1989));Wilson v. Meeks, 52 F.3d 1547, 1552 (10th Cir.1995) (looking at factors to be considered for reasonableness standard, which has been "clearly established" for purposes of §1983 actions).

Defendants'citing of Nagol v. State of N.M., 923 F.Supp. 190 (D.N.M.1996) as support for their defense of qualified immunity merely distracts from the salient issues in the present case. The plaintiff in Nagel did not contest that he was questioned during the course of a lawful investigative stop. Id. at 193. Instead, he argued that the officer "should have known" that a New Mexico statute prohibiting an individual from concealing his identity should be invalidated.  In the present case, the initial stop had nothing to do with Plaintiff's refusal to identify himself, and, unlike the plaintiff in Nagel, Bain is contesting the validity of the initial stop.

3.    Whether Defendants Are Entitled to Summary Judgment

With Plaintiff having satisfied the two-fold qualified immunity inquiry, Defendants are entitled to summary judgment only if they can show that no issue of fact remains as to whether the force they used in effecting Plaintiff's arrest was necessary and reasonable.  Guevara contends

that his use of force was justified.  He testified that Plaintiff refused to comply with his orders to stop (hence, the use of his foot to impede Bain's escape) and that he was concerned for his own safety until he could conduct a weapons search.  In Guevara's narrative, Bain took a combative stance, and both he and Bain wound up on the ground after tripping on the curb, with Bain still struggling to get away. By the time Apodaca arrived, Bain was still actively trying to get up, and Guevara forced him back to the ground.

Apodaca recounted that he saw both Guevara and Bain wrestling and "rolling around." Ex. D at 7.  Guevara did not appear to have control of Bain.  Apodaca grabbed his Taser, yelled to clear in order to warn Guevara that he was about to deploy the Taser, and aimed it at Bain's chest area.  Apodaca expected Bain to be incapacitated by the Taser shot to the chest, but the Taser did not have its intended effect.  Guevara stated he saw prongs inserted into Bain's chest area, and that he, too, noticed that the Taser had not been effective.  Bain was still moving around and continuing to actively resist.[10]  Apodaca then deployed the Taser to the left side of Bain's neck, and then on the right side, all the while having difficulty trying to get surface contact with both Taser prongs because Bain kept swinging his arms and trying to get away. Apodaca used the Taser for the third time, this time to the back of Bain's neck.  Bain became incapacitated sufficiently for Apodaca and Guevara to subdue him.  Guevara put Bain in handcuffs and sat him on the curb.

Apodaca stated that Bain became argumentative after he was handcuffed. Guevara remembered asking Bain why he struggled so much when all he wanted to do was verify if Bain

---

[10]  Apodaca realized later that the multiple layers of clothing worn by Bain prevented the Taser darts from reaching the skin.

17

was involved in the burglary, and then "cut [him] loose."  Bain responded with "I'm tired of the police f-----g with me").  Ex. B at 100.

Plaintiff counters Defendants' statement of facts with his own facts that must preclude summary judgment for Defendants.  In Plaintiff's factual universe, Guevara kept tripping him onto the ground while he simply stood there.  Bain states that he walked *toward* Guevara, not away from him, when Guevara first stopped him.  Ex. C at 334.  He showed no resistance, yet Guevara grabbed him by the arm. What is most striking is Bain's contention that he and Guevara never went to the ground or struggled.  In fact, Bain's position is that he was still standing when Apodaca first used the Taser on his chest area, and that the first Taser shot immediately felled and subdued him.  This is in stark contrast to Defendants' position that Bain was wrestling with Guevara when Apodaca arrived and when the Taser was first deployed, and that it took four Taser shots to subdue Plaintiff.[11]

To say that factual disputes abound in this case is a gross understatement. The reasonableness of Defendants' use of force depends on the resistance and danger posed by the Plaintiff.  The reverse is also true.  Since there is no right to resist a peaceful arrest, State v. Doe, 92 N.M. 100, 103 (1978), the reasonableness of Plaintiff's resistance to Defendants' conduct depends on the unlawfulness of the force used. An arrested person cannot claim the privilege of self-defense unless more than necessary force is used, or where an officer commits an assault on

---

[11]  In his deposition, Apodaca stated that Guevara and Bain were "on the ground, a wrestling match," when he got to the scene. Ex. D at 7, 11.  Yet a few pages later, Apodaca stated that when he first deployed the Taser, he expected Bain to "drop to the ground," but it did not happen. Ex. D at 13.  The second statement is inconsistent with Apodaca's original contention that Bain was on the ground when Apodaca first arrived, and when Bain was first Tasered.

an arrested person. State v. Kraul, 90 N.M. 314, 318 (Ct.App. 1977).

The resolution of Plaintiff's Fourth Amendment claims turns on credibility. Based on facts presented by Plaintiff, there is evidence to show that the officers use of force was unreasonable. The material facts as presented by Defendants show that the officers' use of force was justified and reasonable. The Court cannot make this call. Seamons v. Snow, 206 F.3d 1021 (10th Cir. 2000) (judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Accordingly, Defendants are not entitled to summary judgment on Plaintiff's Fourth Amendment claim based on excessive force.

## IV.    Fourth Amendment - Malicious Prosecution (Count III)

Plaintiff claims that he was maliciously prosecuted because Defendants filed false criminal charges against him. The contours of malicious prosecution claims under the Fourth Amendment were clearly established at the time of the underlying incidents. See Albright v. Oliver, 510 U.S. 266 (1994) (plurality opinion) (federal claims for malicious prosecution arise under the Fourth Amendment); Wolford v. Lasater, 78 F.3d 484, 489-90 (10th Cir. 1996). Plaintiff must show, as an element of this claim, a lack of probable cause. Wolford, 78 F.3d 484, 489 (10th Cir. 1996), cited in Taylor v. Meacham, 82 F.3d 1556, 1562 (10th Cir. 1996).

The same disputes of facts which beset Plaintiff's other Fourth Amendment claims also preclude summary judgment on this claim. Again, resolution of Plaintiff's malicious prosecution claim depends on which version is an accurate depiction of the events that took place – in other words, which version is credible. According to Defendants, there was probable cause to believe that Plaintiff committed the crimes of Assault Upon Peace Officer and Resisting Arrest. Guevara

19

testified that Bain came toward him with threatening gestures. Bain claimed that he never touched Guevara, never threatened Guevara either verbally or with gestures, and did not express his anger in any way. Both Guevara and Apodaca testified that Bain physically struggled with Guevara. Plaintiff testified that he just stood there, and Guevara tried to trip him to the ground and grabbed his arm.  Defendants contend that the independent investigation conducted by the District Attorney's Office, and its decision to proceed with the case against Plaintiff, constitutes evidence of probable cause.  However, the prosecution was initiated by, and based on, the Criminal Complaint generated by Guevara, which itself is subject to a credibility determination.

Plaintiff has asserted a violation of a constitution right under the Fourth Amendment for malicious prosecution.  However, disputes of material fact exist which bar Defendants' entitlement to summary judgment.

## V.      Punitive Damages

Plaintiff seeks punitive damages against the individual Defendants. Punitive damages may be assessed against an officer in his individual capacity for a violation of a plaintiff's constitutional rights, where the evidence shows that a defendant acted with "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law." Smith v. Wade, 461 U.S. 30, 56 (1983). However, where an official makes mistakes in judgment in the performance of their duties, sufficient to subject them to liability for actual damages, that official is not automatically liable for a punitive damages award.  See, Melton v. Okla. City, 879 F.2d 706, 73 (citation omitted), overruled on other grds., 928 F.2d 920 (10th Cir. 1989).

Defendants contend that the evidence does not support a showing for the requisite culpable mental state.  I find that a ruling on this issue would be premature, since the facts upon

which that showing must be made are disputed.  Therefore, Defendants' motion for summary

judgment on Plaintiff's claim for punitive damages is denied at this time.

**VI.      State Claims Brought Under New Mexico Tort Claims Act**

Counts IV, V and VI are claims for Assault and Battery, False Imprisonment, and

Malicious Abuse of Process, respectively, brought under the New Mexico Tort Claims Act

("NMTCA").  The specific provisions of the NMTCA limit potential tort liability of a

governmental entity and its employees.  See Pemberton v. Colorado, 105 N. M. 476, 477, 734 P.

2d 254, 255 (Ct. App. 1987). The NMTCA provides governmental entities and public employees

with immunity from tort suits unless there is a specific waiver of that immunity set forth under the

Act.  See Weinstein v. City of Santa Fe, 121 N. M. 646, 649, 916 P. 2d 1313, 1315 ( 1996). The

court must strictly construe any provision purporting to waive governmental immunity. See

Armijo v. Department of Health & Environment, 108 N. M. 616, 618, 755 P. 2d 1333, 1335 (Ct.

App. 1989).

Section 41-4-12 of the NMTCA waives immunity for various torts caused by law

enforcement officers when acting within the scope of their duties.  Defendants construct their

defense against this claim on the facts they have presented which, they argue, show that the

officers were lawfully conducting an investigation, and that any force used in the course of the

investigation was reasonable.  These facts, as I have mentioned earlier, are subject to scrutiny by a

fact finder.  Therefore, Defendants' summary judgment motion will be denied on Plaintiff's state

tort claims of assault and battery, and false imprisonment.

In New Mexico, the Supreme Court has merged the torts of malicious prosecution and

abuse of process into a single cause of action known as malicious abuse of process.  DeVaney v.

Thriftway Mktg. Corp., 124 N. M. 512, 953 P.2d 277, 285-86, cert. denied, 524 U. S. 915

(1998).  The elements of a malicious abuse of process claim are: (1) the defendant initiated

judicial proceedings against the plaintiff; (2) an act by the defendant in the use of process other

than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the

defendant in misusing the process to accomplish an illegitimate end; and (4) damages.  In a claim

for malicious abuse of process, the plaintiff has the burden of proving that the defendant initiated

judicial proceedings against him or her.  Id.

While an unfavorable termination for Plaintiff would demonstrate the existence of

probable cause in initiating a prosecution, a favorable termination is not a required element of a

malicious abuse of process claim. Thus, the circumstances surrounding the dismissal of the

charges against Plaintiff are not relevant to this claim.  What *is* relevant and required is that

Plaintiff must show that these charges were brought without probable cause. See DeVaney, 124

N.M. 512, 520-21, 953 P.2d 277, 285-86 ("filing of proper complaint with probable cause, and

without any overt misuse of process, will not subject litigant to liability for malicious abuse of

process, even if it is the result of malicious motive").  As with Plaintiff's federal claim of malicious

prosecution, most of the material facts that would support (or dispel) a showing of probable cause

are disputed.  Thus, Defendants are not entitled to summary judgment on Plaintiff's claims under

the NMTCA.

## VII.   Supervisory Liability Against City of Albuquerque (Count VII)

The Tort Claims Act  makes government "responsible for the torts of its employees. . .

under the doctrine of respondeat superior. . . ." Medina v. Fuller, 126 N.M. 460, 463 (Ct.App.

1998); N.M.S.A. 1978, § 41-4-4(E).  As Plaintiff describes it, Plaintiff's supervisory claims

against the City "rise or fall" with my ruling on the underlying state tort claims. I have denied summary judgment on those claims. Therefore, summary judgment is also denied on Plaintiff's supervisory liability claims.

### Conclusion

The Court concludes that Plaintiff has adequately stated violations of constitutional rights for his Fourth Amendment claims, and that applicable Tenth Circuit and Supreme Court case law clearly established these rights at the time of the alleged violation. I also find that genuine issues of material fact exist on these claims. Accordingly, Defendants are not entitled to summary judgment on Plaintiff's federal claims. Further, the same material facts that are disputed as to these federal claims also preclude summary judgment on Plaintiff's state tort claims.

**THEREFORE,**

**IT IS ORDERED** that the City Defendants' Motion for Summary Judgment to Dismiss Plaintiff's Claims (**Doc. 18**) is hereby DENIED for reasons set forth in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE